**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **RUSSELL LARSON,** | ) ) ) | |
| Plaintiff, | ) ) | Case No. 18-01184-STA-dkv |
| v. | ) ) ) | **Chief District Judge Anderson** |
| **MADISON COUNTY, TENNESSEE,** | ) ) | **Magistrate Judge Vescovo** |
| Defendant. | ) ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Russell Larson, by and through counsel, hereby states for his First Amended Complaint against Defendant Madison County, Tennessee, as follows:

### I. INTRODUCTION

1. The Walter Baker Harris Juvenile Court Building ("the Courthouse"), located in Jackson, Madison County, Tennessee, is not fully and readily accessible to persons with mobility impairments and other physical disabilities and it has not been for a long time.

2. After many years of inaccessibility, a site inspection completed by an expert from PDS America on July 16, 2018, found that the Courthouse does not comply with the most basic accessibility standards for public buildings required by the Americans with Disabilities Act and Rehabilitation Act (Doc. No. 1-3, Exhibit A, Plaintiff's Expert Report). Problems noted by the expert included steps leading to the front door, steps leading from the building's main lobby to the main level, non-accessible parking spaces marked as handicap, a non-compliant ramp, and a non-compliant elevator.

1

3. Since the initiation of this action, it has come to light that Madison County sought to make some accessibility changes. It allotted funds to install an ADA-compliant ramp leading to the main lobby of the building, a wheelchair lift in that lobby, and accessible parking in the front and rear of the building. These were installed at the Courthouse in late 2018 and/or early 2019, after this action was filed.

4. These changes remain incomplete (as of this filing) and have, unfortunately, given rise to and/or failed to remedy *even further* ADA accessibility problems. These include: (1) the chair lift appears to have been installed incorrectly, (2) bathrooms are inaccessible, (3) the elevator remains non-compliant and largely inaccessible, (4) important public areas are located on the top floor of the Courthouse, which is inaccessible, and (5) the courtroom itself is potentially inaccessible to persons with wheelchairs.

5. Plaintiff Russell Larson is a long-time local attorney and Madison County resident. Mr. Larson has a "disability" as that term of art is defined by both the ADA and Section 504 because, due to a physical impairment known as arthrogryposis (contracted joints), he is substantially limited in the ability to stand and walk. Mr. Larson uses a wheelchair for mobility.

6. The long-term failure of the County to make the Courthouse fully and readily accessible violates both the Americans with Disabilities Act, as amended (ADA), 42 U.S.C. § 12131 *et seq*., and the Rehabilitation Act, 29 U.S.C. § 794. Therefore, Plaintiff brings this action against Madison County, Tennessee, seeking appropriate declaratory, injunctive, and monetary relief.

## II.   THE PARTIES

7. Plaintiff Russell Larson ("Plaintiff") is a citizen of the United States and currently resides in Madison, Tennessee.

8. Defendant Madison County, Tennessee ("Defendant" or "Madison County") is a political subdivision of the State of Tennessee located in West Tennessee. It operates the juvenile division of its General Sessions court and its probate court from the Courthouse, which is located at 110 Irby Street, Jackson, Tennessee 38301.

9. Defendant is a "public entity" within the meaning of the ADA and receives federal funding for purposes of Section 504. 42 U.S.C. § 12131(1)(A).

### III. JURISDICTION & VENUE

10. This court has jurisdiction over this case pursuant to 42 U.S.C. § 1331 (federal question jurisdiction).

11. Venue is proper in the Western District of Tennessee under 28 U.S.C. § 1391(b)–(c).

### IV. LEGAL BACKGROUND

12. Title II of the Americans with Disabilities Act, as amended, provides, "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

13. The Rehabilitation Act, 29 U.S.C. § 794(a), provides that "no otherwise qualified individual with a disability" may be discriminated against on the grounds of that disability by any program receiving federal funding.

14. The term "public entity" includes local governments. 42 U.S.C. § 12131(1)(A).

15. A "qualified individual with a disability" within the meaning of the ADA and Rehabilitation Act is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and serves, meets the essential

3

eligibility requirements for the receipt of services or the participation in programs or activities provided by the public entity." 42 U.S.C. § 12131(2); 29 U.S.C. § 705(20)(B). An individual with a disability is "qualified" "with respect to services" if he or she "meets the essential eligibility requirements for the receipt of such services." 28 C.F.R. § 41.32(b).

16. The ADA and Rehabilitation Act are similar in substance, aside from the federal funding requirement in the Rehabilitation Act, and therefore the standards and case law applicable to one are generally applicable to the other.

17. The ADA provides that the Attorney General is to promulgate regulations to implement Title II. 42 U.S.C. § 12134. These have been promulgated at 28 C.F.R. Ch. 1, Pt. 35. The regulations distinguish between structures that have been built or altered since January 26, 1992, 28 C.F.R. § 35.151, and those that have not been and are labeled "existing facilities," 28 C.F.R. § 35.150.

18. Whereas the new and altered structures must meet specific architectural standards, 28 C.F.R. § 35.151(c), existing facilities must meet a general standard that "[a] public entity shall operate each service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities," 28 C.F.R. § 35.150(a).

19. To the extent that structural changes had to be made to existing facilities to make them readily accessible, the changes had to be made by January 26, 1995. § 35.150(c).

20. Any element of an existing facility that is altered on or after March 15, 2012, must be in full compliance with modern ADA standards. § 35.150(b)(2)(i).

21. When a public entity claims that an alteration would constitute an undue financial or administrative burden, the burden is on the public entity to so demonstrate in a formal decision by the head of the public entity after "considering all resources available for use." § 35.150(a)(3).

4

22. If the public entity demonstrates a financial or administrative burden through this process, it must still "take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity." § 35.150(a)(3).

## V. FACTUAL BACKGROUND

### A. The Walter Baker Harris Juvenile Court Building

23. The Madison County Juvenile Court, Juvenile Court Clerk, and Probate Court are located at the Walter Baker Harris Juvenile Court Building ("the Courthouse"), 110 Irby Street, Jackson, TN 38301.

24. The Madison County Juvenile Court, a division of the Madison County General Sessions Court, handles a variety of legal matters related to children, including juvenile justice, child welfare, child support, and child custody disputes. It holds regular public court sessions and operates a Juvenile Court Clerk's office that is open to the public daily.

25. Because the Courthouse mainly houses the Juvenile Court, the Courthouse also accommodates other functions relating to juvenile court. For example, the basement contains family visitation rooms, and the Madison County Court Appointed Special Advocate (CASA) office is located on the second floor.

26. The Madison County Probate Court also holds regular public court sessions at the Courthouse and operates a Probate Court Clerk's office from the Courthouse that is open to the public daily.

27. Other courts also sometimes meet in special sessions at the Courthouse.

28. Due to the type of cases heard at the Courthouse (probate and juvenile), individuals with disabilities, including mobility issues, regularly attend court sessions. Of special concern are

children who sometimes come under the Court's jurisdiction because of their disabilities, such as in cases of neglect and abuse, and elderly people who come to probate court.

29. The Courthouse is a three-story brick building. It was built between 1947 and 1950 as the Student Union Building for Union University. The County acquired the building and converted it into the Courthouse sometime after Union University moved to its current campus in 1975.

30. As much as three-quarters of the building is unoccupied and uninhabitable due to dilapidated and unsafe conditions, including the presence of asbestos.[1] Problems such as broken windows in unoccupied portions of the building are clearly visible from the outside. Inside, there is crumbling plaster/stucco, peeling paint, and a number of unused and unusable rooms, such as the former student cafeteria and kitchen. There has recently been flooding in the basement.

### B. Continuing Problems at the Courthouse

31. Defendant has been aware of problems with accessibility at the Courthouse for at least 13 years. On July 25, 2005, Madison County reached a settlement agreement with the U.S. Department of Justice regarding accessibility issues at the Courthouse (along with other public buildings) as part of the Department's Project Civic Access.[2] That Agreement required Madison County to make changes to, among other things, the parking, entrances, lobby door, elevator,

---

[1] *The Jackson Sun*, "Madison County can't house all its juvenile offenders" (Aug. 17, 2014), *available at* https://www.jacksonsun.com/story/news/local/2014/08/16/madison-county-house-juvenile-offenders/14187791/ (last visited Sept. 17, 2018).

[2] U.S. Dept' of Justice, Civil Rights Division, Project Civic Access, https://www.ada.gov/civicac.htm#TN (last visited Sept. 17, 2018); Settlement Agreement between United States of America and Madison County under the Americans with Disabilities Act, DJ 204-72-48, *available at* https://www.ada.gov/madisontnsa.htm (last visited Sept. 17, 2018).

6

Clerk's Office, restrooms, and drinking fountains at the Courthouse.[3] It is unknown if the County undertook the changes required by the Agreement.

32. Moreover, in 2014, an article was published in the Madison County newspaper, *The Jackson Sun*, regarding problems with the Courthouse and the need for a new courthouse. These problems included the fact that the courtroom was not accessible to persons with a disability.[4] The article interviewed or quoted a number of Madison County officials about the problems with the Courthouse, including Juvenile Court Judge Christy Little (who advocated for a new courthouse), Madison County Mayor Jimmy Harris, Madison County Finance Director Mike Nichols, and Madison County Commissioner Ann Harrell. Upon information and belief, no action was taken in response to this article. Instead, the problems were known and discussed, but the Defendant was deliberately indifferent to bringing the facility into legal compliance.

33. According to documents exchanged by the parties after the initiation of this action, the County most recently conducted a study of the Courthouse's accessibility in March and April 2018 at the request of Judge Little. This study noted numerous accessibility issues with the Courthouse, including the following:

    a. "The condition of this building is in average / below average condition considering the 70-year age of the original structure."

    b. "While the building has ADA access, it is, in many cases, inconvenient and cumbersome" (discussing the long route to the elevator and from the elevator to the courtroom).

    c. "There have been several fall incidents [on the exterior steps], especially during egress due to the step down coming out of the door."

---

[3] Settlement Agreement, Appendix K, at § 4, *available at* https://www.ada.gov/madisontnattk.htm (last visited Sept. 17, 2018).

[4] *The Jackson Sun*, "Madison County can't house all its juvenile offenders" (Aug. 17, 2014), *available at* https://www.jacksonsun.com/story/news/local/2014/08/16/madison-county-house-juvenile-offenders/14187791/ (last visited Sept. 17, 2018) (stating that "[t]here is no handicap access" to parts of the Courthouse and a new courthouse building "would need to be handicap accessible").

      d. "It was discovered, that of several occasions [sic], our staff have physically carried people to the stairs to the level of the courtroom. This generates great risk for liability to the county as well as the risk of injury to the employee. This must be addressed and the practice halted."

(*See* Exhibit B, Defendant's Expert Report.)

34. In order to address some of these obvious accessibility issues, unbeknownst to the Plaintiff, the County appropriated minimal funds in April 2018. It appears the County did so without consulting an ADA expert in accessibility issues and, as a result, the suggested improvements were woefully inadequate, incomplete, and in the case of directional signage ("wayfinding"), comically bad.

35. The County did install a ramp and platform to level the main entrance of the building and install a chair lift in the lobby. Handicap parking spaces were also added to the front entrance of the building.

36. At the time Plaintiff filed his lawsuit in September 2018, these improvements had not been made, despite the fact that the County had received the report, solicited bids, and appropriated funds six months earlier. The improvements were not installed until late 2018 and/or early 2019, almost a year after the improvements were first recommended.

37. Unfortunately, even after the County's efforts, and continuing to this date, the Courthouse remains inaccessible. The "improvements" were insufficient, taken without due care, and did not resolve the most basic accessibility issues for Plaintiff or persons like him. These are catalogued below.

### 1. The Lobby

38. Inside the main entrance of the Courthouse is a small lobby with a metal detector and area for security personnel. (Ex. A, p. 3, § 3.) Two sets of stairs (approximately 10 steps each) lead from the lobby to the main level of the Courthouse, where the clerk's offices, courtroom,

and other offices are located. The Probate Court Clerk's Office is located up a set of stairs to the left. The child support office, courtroom, and access to the remainder of the building are located up a set of stairs or chair lift to the right. (*See gen.* Exhibit C, Photos of Lobby & Lift.)

39. In January 2019, a wheelchair lift was installed on the right side of the lobby, the side leading to the courtroom and the majority of the building. Upon viewing in May 2019, the lift appears to have been installed incorrectly or unsafely. Bolts are missing from the left side of the lift, causing it to tilt visibly to one side. (*See* Ex. C, pp. 2-4.) This tilt becomes more pronounced when the lift is in use, particularly if a heavy person is placed on the lift.

40. Moreover, the lift does not allow direct access to the Probate Court Clerk's office, on the opposite side of the lobby. (*See* Ex. C, p. 5.) Instead, a person utilizing the lift must be escorted by courthouse personnel through the child support office, through a series of non-public, unlit and darkened rooms (including the former cafeteria), and through a back entrance into the Probate Court Clerk's Office (explained more in Section 4, below).

## 2. The Ground Floor ("Basement")

41. The rear of the building features an entrance onto the "Basement" level of the building. This entrance is meant to be accessible to persons with a disability and to offer ground-level access to the actual elevator (as opposed to the chair lift). However, the rear entrance is kept locked. A sign on the door instructs persons needing to use this entrance to call a phone number. (*See gen.* Exhibit D, Photos of Basement.)

42. Inside, the elevator is located down a long hallway, which is currently under construction due to recent flooding. (*See* Ex. D, pp. 1-4.)

43. Off this hallway is a set of double doors leading to the family visitation rooms and, according to a sign in the hallway, the handicap-accessible restrooms. However, these double

doors feature door knobs that must be turned and pulled outward, meaning they are not ADA compliant. (*See* Ex. D, pp. 2-3.)

44.     If one could open these doors, the hallway and rooms are under construction due to recent flooding and are not currently in use. (*See* Ex. D, p. 5.) This includes two restrooms, one of which is supposed to the ADA compliant, though it is located behind non-complaint doors and thus inaccessible (discussed more in Section 6, below).

### 3. The Elevator

45.     The elevator itself is not ADA compliant. It is undersized, has out-of-date controls, and is missing other accessibility features. (Ex. A, p. 4, § 7.) This makes it difficult for a person in a wheelchair or similar device to maneuver themselves into position in the elevator. (*See gen.* Exhibit E, Photos of Elevator.)

46.     The elevator, which measures approximately 5.75 feet by 8 feet, is so small that a person in a wheelchair cannot turn around to push the buttons (located next to the door). (Ex. E, pp. 4-9.) Instead, *another person* must ride with them to activate the buttons and assist with entering and exiting the elevator. The walls of the elevator show clear scratches and punctures, probably caused by persons trying to fit and maneuver in the small space. (Ex. E, p. 8.)

47.     Moreover, the elevator doors are not flush with the walls, but rather inset approximately 18 inches. This requires a person to maneuver through an opening even smaller than the elevator itself in order to enter the elevator. (*See* Ex. E, pp. 1, 3, 4.)

48.     The elevator also is not readily accessible, as it is kept locked and cannot be "called." Instead, and a person with a disability wishing to use the elevator must call a person, who must then bring a key to unlock the elevator. (Ex. E, p. 2.) According to PDS America, this procedure "requires a minimum 20 minute wait" before the elevator can actually be used. (Ex. A, p. 4,

10

§ 8.) This process is unequal and demeaning for individuals with disabilities, including Mr. Larson, who is an attorney.

### 4. The Main Level ("First Floor")

49. If a person rides the elevator from the basement level onto the main level, where the courtroom is located, he or she will arrive in a dark (unlit) elevator lobby (Ex. F, p. 1). (*See gen.* Exhibit F, Photos of Main Level.)

50. To the left of the lobby, through a doorway, is a large room, lit only by the light through windows, which is used as a storage area for clothing for children in the juvenile court system. There are also construction materials (such as paint) in this room. (*See* Ex. F, pp. 2-5.)

51. Proceeding through this room to the opposite side, there are two paths: down a hallway to the left (again, unlit except for windows) are two unmarked restrooms, which are also unlit (discussed more in Section 6, below). In the center of the opposite wall is a standard-sized door, which leads into another room. (*See* Ex. F, pp. 2, 5.)

52. In the room through the doorway, on one side of a partial wall is a hallway which widens out into a room with a table (presumably used by Courthouse staff) and a time clock. This side of the room is lit by electric lights. (*See* Ex. F, pp. 6-8.) On the other side of the wall is the former cafeteria, which is completely unlit (without electric lights or windows) and contains an old lunch line and chairs. A door on this side of the room leads back into an unused kitchen. (*See* Ex. F, pp. 9-10.)

53. At the end of this two-sided room is a door leading into the child support clerk's office. This door is standard-sized, but the opening is crowded by a desk and filing cabinet, making it narrow. (*See* Ex. F, p. 11.) The office is a large room with several desks, bookshelves, and a long

11

counter running across the front of the room. To the rear, a door way leads to the judge's chambers, the holding cell, and eventually the back entrance to the courtroom.

54.     To gain access to the main Courthouse, a half-door with a turn knob beside the counter lets out into the main hallway of the Courthouse.  Again, this half-door cannot be opened by all persons with disabilities due to the knob. In the hallway, to the left is second story of the lobby (where the stairs and chair lift come out) and to the right is an open doorway to the waiting area for the courtroom. (*See* Ex. F, pp. 12-14.)

55.     From the waiting area, the courtroom is located through a set of double doors.  It is small, with a center aisle with narrow pews/benches on both sides and the judge's bench at the front. Often there is not room for people in wheelchairs or with other devices, who have to sit at the back or in the aisles. (*See* Ex. E, pp. 15-17.)

56.     The bar is a solid wooden wall with openings on each end.  Sometimes there is not room for people in wheelchairs or with other devices to maneuver down the center aisle, across to the end of the bar, and through the openings to approach the bench, counsel tables, or the witness stand.  The witness stand itself is very narrow and placed on a raised platform.  Instead, these people must sometimes sit behind the bar to testify or conduct business.  A small conference room at the back of the courtroom, the only place in the courtroom to conduct consultations in private, is also not readily accessible. (*See* Ex. E, pp. 18-24.)

### 5.   **The Top Level ("Second Floor")**

57.     Across from the double doors leading into the courtroom is an open doorway which leads to the staircase (Ex. G, p. 1). The staircase ascends in four sets of stairs (approximately 6 steps each) with landings in between (Ex. G, pp. 2-5). (*See gen.* Exhibit G, Photos of Top Level.)

58.     The top floor houses the juvenile judge's office, the CASA office, and the Juvenile Court Clerk's Office.  Upon information and belief, the remainder of the floor is not in use.  (*See* Ex. G, pp. 6-9.)

59.     The CASA office and Juvenile Court Clerk's office are essentially inaccessible for those that cannot climb stairs. The only other way to access this floor is the elevator, which, like on the main level, is on the other side of the building from these offices and requires navigating through unused and unlit rooms and hallways.

60.     Moreover, as the Courthouse moves away from use of the elevator to use of the chair lift, this floor and the public offices there have become totally inaccessible.

### 6.  Restrooms and Lack of Directional Wayfinding

61.     Finally, the Courthouse does not provide true access to handicap-accessible restrooms.

62.     Signs in the Courthouse are comically bad at directing disabled persons to accessible bathrooms.  As seen in the attached photos, signage is as follows:

   a. Sign posted by the doorway leading into the courtroom waiting area reads, "Restroom Upstairs," with a diagonal arrow pointing up. (Ex. H, p. 1.)

   b. Sign posted by the stairway from the courtroom waiting area reads, "Restroom Upstairs," with an arrow pointing up. (Ex. H, p. 2.)

   c. Near the top of the stairs, on the second floor, a sign with an arrow pointing down the hall reads, "Restroom." (Ex. H, p. 3.)

   d. Down the hall, the signs posted **on the restrooms** read, "Restroom," and underneath in smaller letters "[Handicap symbol] in Basement." (Ex. H, pp. 4-5.)

   e. When one descends from the top floor to the basement (in the locked elevator on the other side of the building), there is a sign next to the elevator in the basement that reads, "Handicap Restrooms Located on 2nd Floor"—*from where signs just directed you to the basement.* (Ex. H, p. 6.)

   f. Another sign posted at ceiling height in the basement near the elevator reads, "[Handicap symbol] Restroom," but the arrow points toward the double doors

>  (doors with turn knobs that pull out) and thus is not accessible (and also currently under construction). (Ex. H, p. 7.)

(*See gen.* Exhibit H, Restroom Wayfinding.)

63. Ultimately, there are signs regarding restrooms in at least 7 locations: two pointing upstairs from the main level, one pointing down the hall on the top level, two directing from the top level to the basement, one directing from the basement to the top level, and one directing down an inaccessible hallway in the basement. None of these signs mentions the existence of restrooms (handicap or otherwise) on the main level.

64. Yet, upon information and belief, the County now states that the main level—the only level with totally unmarked restrooms—*is* the level that actually contains the Courthouse's ADA compliant restrooms. These are located in the dark hallway off the storage room between the cafeteria room and elevator lobby. (*See* Ex. F; Ex. I, p. 6.)

65. These main level restrooms—unmarked, unlit, and located in an area otherwise off-limits to the public—are not accessible within the meaning of the ADA. (*See* Ex. F; Ex. I, pp. 6-15.)

66. Similarly, while restrooms in the basement (Ex. I, pp. 1-5), main floor (*id.* at pp. 6-15), and top floor (*id.* at pp. 16-18) almost contain stalls with pull bars and open sinks, as required by the ADA (with the exception of one restroom in the basement), it is not clear that these rooms are actually ADA compliant.

67. Even if they are, they are not accessible due to the extreme difficulty of reaching each and every one.

### C.  Plaintiff Russell Larson

68. Russell Larson is a long-time local attorney who requires access to the Courthouse to capably represent clients. As mentioned, due to his disability, the Courthouse is not readily accessible to him.

69. To gain access to the courtroom via the elevator, Mr. Larson must arrive early. He must park his car in the rear of the building, where compliant parking spaces have only recently been installed (and, upon information and belief, their compliance has not been verified). Then, he must call for someone to come unlock the elevator, and wait in the elevator lobby for at least 20 minutes until this person arrives. Then, he must maneuver himself into the small elevator, which is hardly big enough for his wheelchair and in which he cannot turn around. The out-of-date buttons can be difficult to press, if he could even reach them. And when he arrives at the courtroom level, he must travel outside the normal route, through several unused and unlit rooms and doors, creating further difficulties due to his disability, before finally emerging in the child support office next to the courtroom. Then he must go either through the narrow back route to the courtroom (past chambers and the holding cell) or through the turn-knob half-door into the main hallway. This route to the courtroom from the elevator is convoluted and not marked.

70. Alternatively, Mr. Larson must arrive early and go through security at the main entrance in his wheelchair. Upon information and belief, County security policy does not allow security officers to make exceptions for attorneys, so Mr. Larson must wait in line and go through the security devices with the general public, which can be problematic given that his wheelchair obviously contains metal. He must then get on the chair lift, which tilts to the right as he rides, and proceed down the hallway to the narrow aisle of the courtroom.

71. Prior to this litigation, despite decades of working in the Courthouse, Mr. Larson did not know of the existence of the main level or basement restrooms. No one had ever mentioned their existence or offered their use to Mr. Larson. Instead, he travels through the child support clerk's office, cafeteria room, and storage room to the elevator, waits for the elevator to be unlocked,

rides up, traverses through the unused room on the top floor to the restrooms there, and then back down.

72. These processes are embarrassing to Mr. Larson, physically taxing, unnecessary, and discriminatory. As late as May of 2019, the aforementioned "improvements" still did not make the Courthouse accessible to Mr. Larson as the inaccessibility issues remain.

## VI. CAUSES OF ACTION

73. Plaintiff incorporates the foregoing paragraphs 1-72. As detailed in those paragraphs, Defendant has violated the Americans with Disabilities Act, as amended, 42 U.S.C. § 12131 *et seq.*, and Rehabilitation Act, 29 U.S.C. § 794, because the Courthouse is not readily accessible to qualified individuals with physical disabilities as required by those Acts.

## VII. REQUEST FOR RELIEF

74. Wherefore, Plaintiff requests the following relief:

   A. That proper process issue along with a copy of this Complaint requiring Defendant to appear and answer;

   B. A declaration that Defendant has violated federal law, for the reasons outlined above;

   C. A permanent injunction requiring Defendant to ensure that the Courthouse is fully accessible to persons with disabilities as required by federal law, including by implementing suggestions that the Court finds appropriate in Plaintiff's Inspection (Ex. A) and any subsequent inspections;

   D. Any monetary damages sustained by the Plaintiff, including for humiliation and embarrassment;

E.	Reasonable attorneys' fees and costs, pursuant to 29 U.S.C. § 794a(b) and 42 U.S.C. § 12133; and

F.	Any other legal or equitable relief to which Plaintiff is entitled.

Respectfully submitted,

s/ James S. Haywood, Jr.
HAYWOOD LAW, PLLC
James S. Haywood, Jr. (TN BPR No. 009482)
50 Boyd Ave.
P.O. Box 438
Brownsville, TN 38012
(731) 772-9127 Telephone
(731) 772-0051 Fax
jim@haywoodlaw.net


s/ Justin S. Gilbert
GILBERT McWHERTER SCOTT BOBBITT PLC
Justin S. Gilbert (TN BPR No. 1067)
200 W. Martin Luther King Blvd, Suite 1067
Chattanooga, TN 37402
(423) 499-3044 Telephone
(731) 664-1540 Fax
jgilbert@gilbertfirm.com

Caraline E. Rickard (# 34414)
341 Cool Springs Blvd, Suite 230
Franklin, TN 37067
(615) 354-1144
(731) 664-1540 Facsimile
crickard@gilbertfirm.com

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

      I, the undersigned, do hereby certify that a true and exact copy of the foregoing Proposed Scheduling Order has been mailed electronically via the Court's electronic filing system, to all counsel of record, including the following, on June 28, 2019:

**PENTECOST, GLENN,**
**MAULDIN & YORK, PLLC**
James I. Pentecost (#011640)
Attorney for Defendant
106 Stonebridge Boulevard
Jackson, Tennessee 38305
(731) 668-5995
(731) 668-7163 Facsimile

**TEEL & MARONEY, P.L.C.**
Steven W. Maroney (#015545)
County Attorney
425 E. Baltimore St.
Jackson, TN 38301
(731) 424-3315
(731) 424-3501 Facsimile

*Attorneys for Defendant*

                                                                  s/ Justin S. Gilbert